**TEXAS BUILDERS' SUPPLY CO. et al. v. FANNIN INV. CO.**

**No. 2387.**

Court of Civil Appeals of Texas. Beaumont. Feb. 22, 1934.

Rehearing Denied May 2, 1934.

———◇———

Renfro & Keen, of Beaumont, for appellant C. T. Booth.

Lipscomb & Lipscomb, of Beaumont, for appellee Texas Builders' Supply Co.

COMBS, Justice.

This is the second appeal of this case; the opinion on the former appeal being reported as Booth v. Texas Builders' Supply Co. (Tex. Civ. App.) 47 S.W.(2d) 427. The facts are in all material respects the same as on the former appeal.

Appellee, as plaintiff, sued appellant T. E. Danziger, doing business under the trade-name of Texas Builders' Supply Company, for $857 for necessary cost of repairing a roof which had been put on or "built up" on its building in 1926 under a contract between it and Danziger, and on which roof Danziger, in the name of his firm, had executed a written guaranty against faulty material or workmanship for a period of five years. Danziger vouched in appellant J. T. Booth, alleging that, while he made the contract with appellee for the roofing job and gave the guaranty, in truth and in fact he acted merely as the agent of Booth, undisclosed principal, who did all the work and received all the profits of the contract except that he (Danziger) furnished the materials to Booth and was paid by Booth for them. He alleged that Booth authorized and directed him to execute the guaranty to appellee and agreed to stand behind him and protect him against loss by reason of its execution. He pleaded, in the alternative, that, in case plaintiff, Fannin Investment Company, should recover a judgment against him, he have judgment for a like amount over against Booth. The alleged agreement between Danziger and Booth was oral.

Booth answered the cross-action denying in toto the alleged agreement, or that he was the undisclosed principal of Danziger, and further pleaded that any such agreement, if made, was in contravention of the statute of frauds, as being a promise to answer for the debt or default of another and also an oral agreement not to be performed within one year.

The evidence is undisputed as to the making of the contract between appellee and Danziger, the making of the guaranty by Danziger, its breach, and the damages of $857 occasioned appellee thereby. The trial court properly rendered judgment in favor of appellee, Fannin Investment Company, against Danziger. No complaint is made here as to that feature of the judgment.

However, there is a direct conflict in the evidence as to whether the roofing contract was in fact Booth's; he being the undisclosed principal and Danziger merely acting as his agent. There was also a direct conflict as to whether Booth authorized and directed the making of the warranty.

Mr. Danziger's theory of the case may be shown by a quotation from his testimony. After testifying that he had furnished materials and done repair work for the Fannin Investment Company on its building from time to time and that Mr. Baggese, the manager of the company, had requested him to submit a figure for repairing the skylight, metal work, and for reroofing the building, he testified:

"Not being familiar with skylights and glass and material of that sort, I went to my friend, Mr. Booth, and told him what Mr. Baggese had asked of me and would he go on the roof and find out what was necessary for the skylights and while he was there to also figure the area of the roof. I had no intention at that time of letting Mr. Booth put the roof on. We had a roofing crew.

Meantime Mr. Baggese was waiting for me to give him a figure. Mr. Booth came over with the figures. He had been on the roof, found out what was necessary to put the skylights, sheet metal work, glass, etc., and also had a measure of the roof. He had figured out what his sheet metal work and skylight work was worth, and he says, 'Dan, let me put that roof on for you too. My crew are not working and I would like to have the job.' Well, for built-up roofs it would be necessary for us to hire ordinary labor. We had a foreman we could have put on it, but our foreman was busy at something else, and I says, 'All right, Tom, give us a figure on the whole job. I will furnish you with the roofing material. Mr. Baggese has asked me for a five-year guaranteed roof and figure accordingly.' Right there in the office on a scrap of paper he figured the area of the roof, figured the amount of material that was necessary, and gave me a figure. I went to Mr. Baggese and submitted him a figure, the identical figure Mr. Booth had given me. I had made him (Booth) a wholesale price on the felt.

"* * * I said Mr. Baggese wanted a five year guaranteed roof. And while we (the witness and Booth) were figuring materials that was all understood. Mr. Baggese gave me the contract and I immediately gave it to Mr. Booth. I had never been on the roof, was never on the job while the roof was going on and at no time did I figure that the job was mine, only as turning it over to Mr. Booth."

With reference to the making of the guaranty, Mr. Danziger testified:

"A. I recall the incident very well. (The making of the guaranty.)

"Q. All right, tell what it was. A. Mr. Booth, after he finished the job, it wasn't very long afterwards, said, 'Dan, I would like to get the money on that job.' So I said, 'Tom, when I go to Mr. Baggese for this money, he is going to ask me for a five-year guaranteed roof, my five-year guarantee.' He says, 'Well, give it to him. I will stand behind it. I will take care of the roof. Any roof I put on will last five years.'

"Q. All right, what happened then? A. I went to Mr. Baggese with the guarantee and he gave me his check for the $1,260.00.

"Q. What did you do with that check? A. The check is payable to the Texas Builders Supply Company, and I endorsed it over to Mr. Booth and gave it to him. The transaction was never on my books.

"Q. That represented the full contract price? A. The full contract price."

It is shown that Booth cashed the check and that Danziger billed Booth in the regular course of business for the amount of materials which he had furnished on the job.

Mr. Booth's theory of the case is shown by an excerpt from his testimony: "A. Mr. Danziger informed me he was figuring a job for the Fannin Street Investment Company, of which there was some skylights and sheet metal work was required out there, and asked me to go up on the roof and make an estimate on the sheet metal work and furnish it to him. Upon his request I went to the Fannin Street Investment Company's job, went on to the roof, measured the skylights, the flashing, made an estimate, and went down to Mr. Danziger's office and told him I would furnish him the sheet metal work, including the skylights, for so much money. He taken my figures and I presume included them with him. However, two or three days later he informed me that he had the job to put on the roof, and including my work, the sheet metal work. I went to his office. We sat there at his desk and talked over the job a while and finally the subject came up of putting the roof on, and he asked me if I cared to put the roof on for him, that all that he was interested in was his profits out of the sales of the material. I told him I did not know what price he had on the roof, did not know whether he had sufficient money there to put this roof on, and I didn't know what kind of roof he had even figured on. He told me he figured on putting on and would expect me to figure on putting on a two-ply roof, mopping the old roof, putting on one ply, mopping, putting on another ply and mopping the roof entirely. I then told him that I didn't know what price he had on the roof, nor I didn't know how large the roof was. I had never measured it up. I didn't know whether it was 50 squares or 400 squares of roofing. Well, he got out his figuring sheet and told me the number of squares there was on that roof. Now, he says, 'This is my total figure on that job, deducting the sheet metal work, your price, leaves so much money.' Well, I says, 'deduct what you are charging for your material, and if there is sufficient money left there to pay the labor bill, I will be glad to put the roof on for you.' He figured out the number of barrels of asphalt it would take, the number of rolls of felt, all the material, figured it out, and deducted it from what there was left, and told me the number of squares there was

on the roof, and I just merely estimated in my mind it would take so many days labor to put that roof on with so many men, and I said, 'Dan, you have got sufficient money left for the labor on that roof.' He said, 'If you can handle it for that, go ahead and put it on.' I thanked him for the job and went ahead."

With reference to the guaranty, Booth testified: "I did not know that Mr. Danziger was giving a guarantee on that roof. It was a roof that I would not have guaranteed for one year, nothing but a two-ply roof over an old worn-out roof. If I had known that Mr. Danziger was giving a guarantee on that roof, I would have refused to have touched it for him, and if he would have asked me for a guarantee, I would not have touched it, but that was all there was said, that there was sufficient money left there to get up and put on two plies of roof and to mop it."

The court submitted to the jury two issues, as follows:

"Special Issue No. 1. Do you find from a preponderance of the evidence that defendant J. T. Booth agreed to protect the defendant T. E. Danziger against loss by reason of the execution of the guaranty?" To which the jury answered "Yes."

"Special Issue No. 2. Do you find from a preponderance of the evidence that the defendant T. E. Danziger in executing the guaranty in question relied on the promise of the defendant J. T. Booth to protect Danziger against liability or loss thereon?" To which the jury answered "Yes."

The court entered judgment in favor of appellee against appellant Danziger for its damages in the sum of $857, and also entered judgment in favor of Danziger and against Booth for the same amount.

Appellant Booth complains of the failure of the trial court to submit to the jury the question of whether Danziger, in executing the guaranty, acted as Booth's agent. Numerous exceptions to the court's charge complaining of the failure to submit the question of agency were seasonably presented and overruled. Booth also requested the submission of the following issue: "Do you find from a preponderance of the evidence that J. T. Booth authorized, directed and instructed the said T. E. Danziger to sign the guaranty in evidence in this cause for and on behalf of the said J. T. Booth?"

The court refused this requested issue "Because in the main charge."

We think the court erred in refusing to submit this requested issue. On the former appeal this court held that "the evidence clearly raised the issue that the written guaranty was appellant's (Booth's) guaranty executed in his (Danziger's) name and on his (Booth's) behalf by Danziger, as his agent." See 47 S.W.(2d) 427, 429. If the guaranty was so executed, then it was in fact Booth's. contract, an original undertaking, and so not in contravention of the statute of frauds. But if the undertaking was Danziger's, and Booth, as found by the jury in response to the issue submitted, merely agreed to protect Danziger against loss by reason of the execution of the guaranty, then Booth's promise was that of an indemnitor only. And so, being oral and being an obligation not to be performed in one year, it comes squarely within the statute of frauds. R. S. 1925, art. 3995.

Counsel for Danziger urges the proposition that where the principal, in accepting and receiving the price for a contract, acts in the name of his agent, the natural and appropriate method of giving his authority for making a guaranty or warranty of the work, in the agent's name, is to promise the agent that he will protect him against liability, and that, where it is found that the agent has been authorized to execute the warranty, there is a resulting obligation on the part of the principal to indemnify the agent against loss. Counsel cites Mechem on Agency, §§ 155, 653; Clark on Agency, § 371.

The proposition announces a sound proposition of law, but it is not decisive of this case. Unquestionably, if Danziger was Booth's agent, Booth, having accepted the benefits of the contract, would be liable to indemnify Danziger on the warranty under the jury's findings that he agreed to protect Danziger. But counsel's contention on this point assumes that Booth was, in fact, the undisclosed principal of Danziger. The testimony which we have quoted above is sufficient to show that this was a strongly controverted issue of fact. Booth was entitled to have the issue submitted to the jury. This was not done.

For the error discussed, the judgment of the trial court is reversed, and the cause remanded.